# Illinois Official Reports

## Appellate Court

---

### *People v. Brown*, 2020 IL App (1st) 170980

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. KIAR BROWN, Defendant-Appellant. |
| District & No. | First District, Sixth Division<br>No. 1-17-0980 |
| Filed<br>Rehearing denied | March 27, 2020<br>May 8, 2020 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 09-CR-9598; the Hon. Matthew E. Coghlan, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | James E. Chadd, Patricia Mysza, Linda Olthoff, and Michael Gentithes, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg and Marci Jacobs, Assistant State's Attorneys, of counsel), for the People. |

JUSTICE HARRIS delivered the judgment of the court, with opinion. Justices Cunningham and Connors concurred in the judgment and opinion.

## OPINION

¶ 1        Following a jury trial, defendant Kiar Brown was found guilty of first degree murder (720 ILCS 5/9-1(a)(1) (West 2008)) and sentenced to 55 years' imprisonment. We affirmed defendant's conviction on direct appeal. *People v. Brown*, 2013 IL App (1st) 110453-U.

¶ 2        In November 2013, defendant *pro se* filed a petition pursuant to the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2012)), in which he asserted, *inter alia*, a claim of ineffective assistance of counsel based on his counsel's failure to inform the trial court that defendant had overheard an assistant state's attorney tell a witness the contents of previous witnesses' testimonies. The circuit court advanced the petition to the second stage of proceedings under the Act and, on the State's motion, dismissed defendant's petition. Defendant appeals, arguing the court erred by dismissing his petition where he made a substantial showing of a constitutional violation of his right to effective assistance of counsel. We affirm.

¶ 3                              I. JURISDICTION

¶ 4        The circuit court dismissed defendant's postconviction petition on March 22, 2017. Defendant filed his notice of appeal on April 4, 2017. Accordingly, this court has jurisdiction pursuant to Illinois Supreme Court Rule 651(a) (eff. July 1, 2017), governing appeals in postconviction proceedings.

¶ 5                              II. BACKGROUND

¶ 6        Defendant's arrest and prosecution arose out of the April 25, 2009, shooting death of Zachary Allmon, which occurred at approximately 4:30 p.m. on the 5200 block of South Carpenter Street in Chicago. The shooting was witnessed by two young girls, M.O. and A.M., who were playing outside at the time, and Andrell Singleton, who was eating in his car directly across the street from where the final shots were fired. M.O., A.M., and Singleton identified defendant as the shooter both in a lineup and at trial.

¶ 7        Prior to defendant's jury trial, the parties made a mutual motion to exclude witnesses, which the trial court granted.

¶ 8        At trial, M.O. testified that she was 12 years old at the time of the shooting. At approximately 4 p.m. on April 25, 2009, she, her cousin A.M., and her four-year-old sister were outside her father's house on the 5200 block of South Carpenter Street playing with her father's dog. The girls played on the outside of a fenced area because A.M. was scared of the dog, which was inside the fenced area. Allmon, who M.O. knew from the neighborhood, walked by, and they said "hey" to each other.

¶ 9        Shortly thereafter, M.O. heard gunshots. She pushed her little sister to the ground and got on top to cover her. Three to four seconds later, M.O. looked up and saw Allmon lying on the sidewalk with defendant standing over him. Defendant then shot Allmon three or four times.

In total, M.O. heard 9 or 10 gunshots. A.M. leaned on a gate in M.O.'s father's yard, and the dog ran out and chased defendant. Defendant ran to a light blue van, got in the passenger seat, and the van drove off "fast." M.O. identified defendant in court as the shooter.

¶ 10 The girls ran inside M.O.'s father's house after the shooting stopped. When police arrived at the scene, M.O. described the shooter as a "light-skinned boy with box braids with beads on it." M.O. also told police the shooter was wearing an all-black outfit and a black hat. His jacket had the brand name "Coogi" on it. On cross-examination, M.O. admitted that when she first spoke with police, she did not say defendant had box braids; instead she told them he had "braids with beads, clear or white."

¶ 11 On May 2, 2009, M.O. went to the police station with her mother and A.M. Before she viewed the lineup, the police advised M.O. the shooter may or may not be in the lineup and she was not required to make an identification. Separated from A.M., M.O. identified defendant as the shooter in a live lineup. M.O. testified that defendant's hair and clothing had changed when she viewed the lineup, but she was still able to recognize defendant as the shooter. M.O. also made a handwritten statement, in which she stated defendant's hair was "braided back in French braids" which, according to M.O.'s testimony at trial, were the same as box braids. On May 8, 2009, in front of the grand jury, M.O. identified defendant as Allmon's shooter in a photograph.

¶ 12 A.M. testified that she was 11 years old at the time of the shooting. At approximately 4:30 p.m., she was at her uncle's house on South Carpenter Street with M.O. and M.O.'s sister. As the girls were sitting on the porch, Allmon, who A.M. knew from the neighborhood, walked by, and they said "hey" to each other. The girls then moved to a gate on the side of the house and played with M.O.'s father's dog. The dog stayed inside the fenced area while the girls played outside the fenced area because A.M. was initially scared of the dog.

¶ 13 A.M. heard gunshots, and she and M.O. pushed M.O.'s sister to the ground and covered her. A.M. looked up to the left and saw Allmon lying on the sidewalk. Defendant, who she had seen previously in her neighborhood and who she identified in court, was standing over and shooting Allmon as he lay on the ground. A.M. heard "about eight" gunshots.

¶ 14 A.M. then leaned on the gate, and M.O.'s father's dog ran out of the fenced area and chased defendant to a "bluish green" car. Defendant "jumped in" the passenger side of the car, and the car drove off "fast."

¶ 15 A.M. looked at Allmon and then ran into the house. A.M.'s uncle told the girls to sit on the couch, and he called the police. When the police arrived, A.M. told them the shooter had "box braids," light skin, and was "kind of tall" and "lanky." A.M. also told the police the shooter was wearing a black "Coogi outfit," with black and white shoes and a "hoodie." A.M. saw the "Coogi" logo on defendant's pants, not his jacket. A.M. testified nothing was covering defendant's face at the time of the shooting.

¶ 16 On May 2, 2009, A.M. went to the police station with M.O. and M.O.'s mother. Prior to viewing the lineup, the police advised A.M. the shooter may or may not be in the lineup and she was not required to identify someone. A.M. viewed a live lineup separately from M.O. and identified defendant as the person who shot Allmon. After viewing the lineup, she met with an assistant state's attorney and identified defendant as Allmon's shooter in a photograph. A.M. denied telling the assistant state's attorney that she had only seen the side of defendant's face. On May 8, 2009, in front of the grand jury, A.M. identified defendant as Allmon's shooter in a photograph.

¶ 17        Singleton testified that he knew both Allmon and defendant. He went to school with defendant's sister, defendant went to school with his brother, and Singleton had seen defendant around the neighborhood. At approximately 4:30 p.m. on April 25, 2009, Singleton was sitting in his parked car across the street from his house located in the 5200 block of South Carpenter Street. He saw Allmon standing on the corner of 52nd Street and Carpenter Street. A "sky blue" station wagon "roll[ed] up," and someone got out. Singleton heard two gunshots and ducked down. He looked behind him and saw someone chasing and shooting at Allmon. Allmon fell to the ground in front of Singleton's house, and defendant fired "like five more shots" into Allmon's back. Singleton identified defendant in court as the shooter.

¶ 18        After the shooting stopped, Singleton saw defendant place a gun in his right pocket and walk toward the station wagon. As defendant was walking toward the car, Singleton saw defendant's face and immediately recognized him. At the time, defendant was wearing a White Sox hat, designer jacket, some blue jeans, and gym shoes. Defendant had braids with beads on them. Defendant got into the station wagon, and it sped away south on Carpenter Street.

¶ 19        Singleton got out of his car, ran toward Allmon, and called the police. Singleton told the operator he saw a sky blue station wagon but had "ducked down" in his car and did not see the shooter. Singleton explained he told the operator he did not see the shooter because his primary concern was to get help for Allmon and if he "would have answered one question that would have led to another one, another one, another." Singleton also explained he was not "ducked down" in his car for the entire occurrence. When the police arrived, he spoke to them and told them what he had seen, but he did not tell them defendant's name because he did not feel it was safe to do so.

¶ 20        On April 27, 2009, Singleton was at his children's mother's house. While there, the police were called, and Singleton was placed in the back of a squad car because someone told the police he "broke into the house or something." After checking his identification card, a police officer was going to let him leave, but Singleton asked the officer whether he knew anything about Allmon's shooting. The officer asked Singleton what he knew, and when he began giving information, the officer asked him to go to the station to give a statement. Singleton was not under arrest and went to the station voluntarily. He denied he was taken to the station because he had violated an order of protection or violated a law. While at the station, Singleton spoke with detectives and gave a written statement in which he named defendant as Allmon's shooter. Although he had a case pending at the time, Singleton was not promised anything in exchange for his cooperation.

¶ 21        On April 28, 2009, Singleton was shown a photographic lineup, and he identified defendant as Allmon's shooter. Later that morning, he spoke with an assistant state's attorney and again identified defendant in a photograph. On April 30, 2009, Singleton identified defendant in a photograph before the grand jury. On May 2, 2009, Singleton was shown a live lineup, and he identified defendant as Allmon's shooter.

¶ 22        Detective John Murray testified that on April 25, 2009, he and his partner, Detective Tom Vovos, were assigned to investigate Allmon's shooting. That day, Murray and Vovos went to the scene and spoke with M.O., A.M., and Singleton. Murray and Vovos obtained a description of the shooter: "Generally, it was a male black between the years of 18 and 20 years old; light-skinned to medium complected [*sic*], thin, five-seven to five-ten, in that area; with braids with white or clear beads on them, wearing dark clothing, with the word Coogi on it." When Murray

spoke with Singleton at the scene, Singleton gave only a general description. He did not tell Murray he wanted to speak with him at a later time or inside his residence.

¶ 23 Two days later, the police were called to a house party attended by Singleton. Singleton "made it be known that he had more information that he wished to tell the detectives." He was not under arrest and came voluntarily to the station to speak with detectives. Based on his information, Detectives Turner and Davis produced a photographic lineup that was presented to Singleton.[1] An investigative alert was issued for defendant, and he was arrested on May 2, 2009. Murray was not present when defendant was arrested. Murray testified that a blue jacket with the word "Coogi" was collected from defendant after his arrest but on cross examination admitted defendant was wearing a "C.K. Starting Dean" jacket that did not have "Coogi" on it.

¶ 24 While defendant was in custody, Murray showed a live lineup including defendant to Singleton, M.O., and A.M. Murray testified he was with Singleton, M.O., and A.M. as they separately viewed the lineup, and all three identified defendant as Allmon's shooter without hesitation. On cross-examination, however, Murray admitted he was with the participants in the lineup when Singleton viewed the lineup, and Vovos was with Singleton. During an interview with an assistant state's attorney, A.M. gave a written statement, which she later signed, in which she stated she saw the side of the shooter's face.

¶ 25 After Singleton identified defendant in the lineup, he spoke with an assistant state's attorney while Murray was present. Murray was not aware Singleton had a pending charge for possession of a weapon, and the charge was not mentioned during the meeting. During his investigation, Murray never learned that Singleton had been detained for a possible violation of an order of protection. Turner and Davis never told Murray that another officer, Officer Mitchell, received an order to bring Singleton to the station.

¶ 26 The State also presented the testimony of a latent fingerprint examiner, a forensic scientist specializing in firearm identification, and a deputy medical examiner, who testified the victim was shot several times in his back. After the State rested its case, defendant moved for a directed verdict, which the trial court denied.

¶ 27 Tenija Ratcliffe testified for the defense. She stated that defendant lived down the street from her grandmother. In April 2009, Ratcliffe braided defendant's hair in individual braids but did not put white or clear beads in his hair. On April 25, 2009, Ratcliffe saw defendant at a barbecue that she was hosting in her boyfriend's grandmother's backyard in the 900 block of West 50th Street. At the time, he did not have French braids and did not have beads in his hair. The barbecue began at approximately 2 p.m., after Ratcliffe returned from the grocery store. Defendant helped her carry the groceries into the house and he stayed for three to four hours, never leaving the barbecue. At approximately 4:30 p.m., Ratcliffe heard "about six or seven" gunshots, which sounded like they came from the south. Defendant was tending the grill at the time.

¶ 28 Defendant elected not to testify and rested his case. The next day, before the jury was brought out, the State indicated it wished to present a portion of defendant's postarrest video-recorded statement to rebut defendant's alibi defense. The State indicated "the detective [was present] to set the foundation." After a lengthy discussion about the propriety of introducing the statement and application of the doctrine of completeness, the trial court ruled it would

---

[1]Turner's and Davis's first names are not identified in the record.

allow the State to play a limited portion of the statement. The court then recessed so the parties could "work on the tape to make sure that [they did not] offer any improper portions."

¶ 29　　The State called Murray in rebuttal, and he testified that he and Vovos spoke with defendant after he was arrested on May 2, 2009. Defendant waived his *Miranda* rights and agreed to speak with the detectives. See *Miranda v. Arizona*, 384 U.S. 436 (1966) The interview room had an audio- and video-recording device that was activated before they spoke with defendant.

¶ 30　　During the interview, defendant told Murray and Vovos that on April 25, 2009, "he got up [and] walked down the block to a barbecue. I believe it was at Re-Re's house." He stated that around 3:00 to 3:30 in the afternoon he then went and played basketball with a subject by the name of Jaylyn Williams. He stated that while he was playing basketball, he heard the shots or shots being fired in the area. Defendant did not tell Murray and Vovos that he was at a barbecue with Ratcliffe at the time of the shooting. On May 2, 2009, Murray spoke with Williams, and after their conversation, defendant remained a suspect in Allmon's shooting. The recording of defendant's statement was played for the jury.

¶ 31　　The jury found defendant guilty of first degree murder and found that he personally discharged a firearm that proximately caused Allmon's death. Defendant filed a posttrial motion, which was later amended. The court denied the motion and sentenced defendant to 55 years in prison, which included a 30-year sentence for first degree murder and a 25-year enhancement based on defendant's personal discharge of the firearm that caused Allmon's death.

¶ 32　　On direct appeal, defendant contended he was deprived of his sixth amendment right to effective assistance of counsel where his trial counsel presented Ratcliffe's alibi testimony, which contradicted his postarrest statement to police. This court affirmed defendant's conviction in *Brown*, 2013 IL App (1st) 110453-U.

¶ 33　　In March 2012, while defendant's direct appeal was pending, he filed a petition for injunctive relief. Defendant alleged that various improprieties in the grand jury process rendered the indictment invalid. The trial court dismissed defendant's petition. Defendant appealed, and appellate counsel was appointed to represent him. We granted counsel's motion to withdraw pursuant to the procedures set forth in *Pennsylvania v. Finley*, 481 U.S. 551 (1987), and affirmed the trial court's judgment. *People v. Brown*, No. 1-12-2413 (2013) (unpublished summary order under Illinois Supreme Court Rule 23(c)).

¶ 34　　In November 2013, defendant filed a postconviction petition in which he asserted a litany of claims, including a claim of ineffective assistance of counsel. His ineffective assistance claim was based on counsel's failure to inform the trial court that defendant had overheard an assistant state's attorney tell Murray the contents of previous witnesses' testimonies, what she was going to ask Murray during his testimony, and what she expected Murray to say in response. No action was taken on the petition within 90 days. Therefore, the circuit court advanced the petition to the second stage and appointed counsel for defendant. Defendant subsequently filed a motion to proceed *pro se*, and the court granted defendant's motion and granted his counsel leave to withdraw.

¶ 35　　The State filed a motion to dismiss defendant's petition. Defendant responded and submitted an affidavit in support of his claim. The court heard the parties' arguments with respect to the State's motion and took the matter under advisement. Thereafter, defendant sought, and the court granted, leave to supplement his petition with additional claims. The

State filed a motion to dismiss the claims in defendant's supplemental petition, and defendant responded.

¶ 36 The circuit court entered a written order granting the State's motion to dismiss defendant's postconviction petition and his supplemental claims. Defendant filed a motion to reconsider, which the court denied. This appeal followed.

¶ 37 III. ANALYSIS

¶ 38 On appeal, defendant contends the well-pled allegations in his petition and affidavit substantially showed that he was deprived of his right to the effective assistance of counsel. Therefore, the court erred by dismissing his postconviction petition.

¶ 39 The Act sets forth a procedure under which a criminal defendant can assert his or her conviction was the result of a substantial denial of his or her rights under the United States Constitution, the Illinois Constitution, or both. *People v. Hodges*, 234 Ill. 2d 1, 9 (2009). The Act contemplates a three-stage proceeding, which is initiated by the filing of a petition. *Id.*; 725 ILCS 5/122-1(b) (West 2012). The petition must "clearly set forth the respects in which [the defendant's] constitutional rights were violated." 725 ILCS 5/122-2 (West 2012). The defendant must attach affidavits, records, or other evidence to support his or her allegations or shall state why they are not attached, but the petition need not contain argument or citation and discussion of pertinent authority. *Id.*

¶ 40 During the first stage, the trial court has 90 days to summarily dismiss petitions that are frivolous. *People v. Brown*, 2015 IL App (1st) 122940, ¶ 43. If the court does not dismiss the petition within 90 days, the matter advances to the second stage. At this stage, the court may appoint counsel to represent defendant, and the State may either move to dismiss or answer the petition. *Id.* If the petition is not dismissed at the second stage, it advances to the third stage for an evidentiary hearing on the defendant's claims. *Id.*

¶ 41 Defendant's petition was dismissed at the second stage on the State's motion. A second-stage dismissal is proper "where the defendant's claims, liberally construed in light of the trial record, fail to make a substantial showing of a constitutional violation." *People v. Turner*, 2012 IL App (2d) 100819, ¶ 21. We accept as true all well-pled facts in the petition and affidavits unless such facts are positively rebutted by the trial record. *Id.* We review *de novo* the second-stage dismissal of a defendant's petition. *Brown*, 2015 IL App (1st) 122940, ¶ 44.

¶ 42 When evaluating a claim of ineffective assistance of counsel, we apply a two-prong test under which the defendant must prove his counsel's performance fell below an objectively reasonable standard and the deficient performance prejudiced him. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *People v. Caballero*, 126 Ill. 2d 248, 259-60 (1989). The defendant must show that counsel's performance was both objectively unreasonable under prevailing professional norms and that there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. *People v. Veach*, 2017 IL 120649, ¶ 30. The burden is on defendant to satisfy both prongs of the *Strickland* test, and the failure to establish either defeats the claim. *Id.*

¶ 43 Defendant asserts the conversation between the assistant state's attorney and Murray violated the court's pretrial witness-exclusion order, and counsel's failure to seek exclusion of Murray's testimony based on the violation denied him the effective assistance of counsel. We

disagree. We find defendant has not made a substantial showing that he was prejudiced by trial counsel's allegedly deficient performance.

¶ 44   Presuming that the conversation with Murray violated the pretrial order, "[a] violation of a court order excluding witnesses or prohibiting witnesses from discussing their testimony does not result in the automatic exclusion of a witness's testimony." *In re H.S.H.*, 322 Ill. App. 3d 892, 896 (2001). Rather, the court exercises discretion to determine whether the exclusion of testimony is the appropriate remedy. *Id.* "The dominant inquiry is whether the inclusion or exclusion of the testimony would prejudice the affected party." *Id.* at 896-97. Thus, if counsel had raised the issue at trial, the exclusion of Murray's testimony would not have been guaranteed.

¶ 45   Furthermore, even if we presume Murray's testimony would have been excluded at trial, it is unlikely the outcome would have been different. The record shows the three eyewitnesses, M.O., A.M., and Singleton, all viewed defendant under circumstances that would permit a positive identification. It is undisputed the shooting occurred in a residential area during the daytime hours. All the witnesses viewed the shooting at close range. M.O. and A.M. were playing outside next door to where Allmon fell to the ground, and Singleton was in his parked car across the street. These eyewitnesses also provided consistent physical descriptions and positively identified defendant as the shooter in photographs, a live lineup, and at trial. Eyewitness identification is sufficient to support a conviction where it was made under circumstances permitting a positive identification. *People v. Slim*, 127 Ill. 2d 302, 307 (1989).

¶ 46   The evidence against defendant was also overwhelming. M.O. testified she was outside playing with A.M. and her sister when she heard gunshots and, after initially covering her sister to protect her from the gunfire, she looked up and saw defendant standing over and shooting Allmon, who lay on the ground. Defendant then got into the passenger seat of a "light blue van," which drove away quickly. Shortly after the shooting, M.O. described the shooter to a police officer, stating he was a "light-skinned boy" with braided hair with clear or white beads and was wearing an all-black outfit that included a "Coogi" jacket and a black hat.

¶ 47   A.M. testified she was outside playing with M.O. and M.O.'s little sister when she heard gunshots. She looked to her left and saw defendant standing over and shooting Allmon, who lay on the ground. Defendant then got into the passenger seat of a "bluish green" car, which sped off. After the shooting, she told a police officer the shooter was "kind of tall," "lanky," had "box braids" and light skin, and was wearing a black "Coogi outfit," with black and white shoes and a "hoodie."

¶ 48   Singleton saw a "sky blue" station wagon drive to the area and let someone out. He "ducked down" when he first heard gunshots and then looked behind him. He observed Allmon fall to the ground and saw defendant fire "like five more shots" into Allmon's back. He then observed defendant walk toward the station wagon.

¶ 49   All three eyewitnesses testified consistently that defendant shot Allmon while Allmon lay on the ground and then he entered the passenger side of a bluish vehicle which sped away from the scene. Even without Murray's testimony, the jury could have found defendant guilty of shooting and killing Allmon. Since the outcome of his trial would not have been different absent Murray's testimony, defendant was not prejudiced by counsel's performance and his claim of ineffective assistance of counsel cannot be sustained. See *People v. Beals*, 162 Ill. 2d 497, 506-07 (1994) (finding no reasonable probability of different result where the State's evidence against the defendant was overwhelming).

¶ 50      Defendant, however, points to numerous inconsistences in the eyewitnesses' testimony and contends he was prejudiced because Murray's testimony "painted the eyewitnesses as reliable, buttressing their identifications in front of the jury." According to defendant, Murray testified the eyewitnesses consistently described the shooter, including his hairstyle, but, in fact, the eyewitnesses inconsistently described defendant's hairstyle in their direct examinations at trial. He claims this was particularly prejudicial as it related to Singleton's testimony because Singleton told the 911 operator he did not see the shooter. Defendant also asserts that Murray's testimony that a "Coogi" jacket was collected from defendant after his arrest bolstered the eyewitnesses' testimony that defendant was wearing a "Coogi" jacket, but on cross-examination, Murray admitted defendant was wearing a different designer brand when he was in custody. Finally, defendant notes that Murray's description of the lineup identifications improperly enhanced the reliability of the identifications in front of the jury where Murray claimed Singleton had made his lineup identification voluntarily and that M.O. and A.M. identified defendant without hesitation.

¶ 51      Minor inconsistencies between the descriptions of defendant's hairstyle, *i.e.*, whether he had box braids, French braids, clear beads, white beads, or no beads, did not render their identifications of defendant unreliable. See *People v. Williams*, 2015 IL App (1st) 131103, ¶¶ 74-75 (minor inconsistencies in eyewitnesses' descriptions does not render positive identifications unreliable). Nor did Singleton's statement to the 911 operator that he did not see the shooter and his failure to initially name defendant as the shooter render his identification unreliable where he testified he was not "ducked down" in his car during the entire occurrence, and he provided a reasonable explanation for his failure to name defendant in his initial police encounter. We reiterate that where the eyewitness identification of defendant was made under circumstances permitting a positive identification, it is sufficient to sustain a conviction. *Slim*, 127 Ill. 2d at 307-08. We have determined that the identification testimony of the eyewitnesses alone, without Murray's testimony, is sufficient to sustain defendant's conviction.

¶ 52      In sum, because the eyewitnesses' descriptions and identifications of the shooter were positive and reliable, there is no reasonable probability the result of trial would have been different but for counsel's failure to seek exclusion of Murray's testimony. Accordingly, defendant's petition did not set forth a substantial showing that he was deprived of his constitutional right to the effective assistance of counsel, and the trial court properly dismissed his postconviction petition.

¶ 53                                        IV. CONCLUSION
¶ 54      For the foregoing reasons, the judgment of the circuit court is affirmed.

¶ 55      Affirmed.